IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| KIMONTI WILSON, | Case No. 3:24-cv-00856-SB |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| LIBERTY INSURANCE CORPORATION, | |
| Defendant. | |

**BECKERMAN, U.S. Magistrate Judge.**

Kimonti Wilson ("Wilson") filed this action against her homeowner's insurer, Liberty Insurance Corporation ("Liberty"), alleging claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and negligence/insurance bad faith. Citing an appraisal provision in Wilson's policy, Liberty moves to compel appraisal and stay this case pending the outcome of appraisal proceedings. The Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) and held oral argument on October 29, 2024. For the reasons explained below, the Court grants Liberty's motion.

///

///

PAGE 1 – OPINION AND ORDER

## BACKGROUND

### I. THE PARTIES

Wilson owned and resided at a property located in Portland, Oregon (the "Property"). (Notice Removal Ex. A ("Compl.") ¶ 1, ECF No. 1-1; Def.'s Answer & Affirmative Defs. ("Answer") ¶ 1, ECF No. 5.) Liberty, a Massachusetts corporation, issued policies covering Wilson's property, including one with a policy period of September 10, 2022 to September 10, 2023 (the "Policy"). (Notice Removal ¶ 7, ECF No. 1; Compl. ¶¶ 2-3; Answer ¶¶ 2-3; *see also* Def.'s Mot. Compel Appraisal & Stay Proceedings ("Def.'s Mot.") Ex. 1 at 1-2, ECF No. 6-1, reflecting the policy period).

### II. THE POLICY

The Policy covered damage to Wilson's Property and personal property. (Compl. ¶ 6; Answer ¶ 6; *see also* Def.'s Mot. Ex. 1 at 2-3, coverages include (1) dwelling with replacement cost, (2) other structures on insured location, (3) personal property with replacement cost, and (4) loss of use of insured location). The Policy also contained the following appraisal provision ("Appraisal Provision"):

> If you and we fail to agree on the amount of loss, an appraisal of the loss may take place. However, both parties must agree to appraisal and to be bound by the results of that appraisal. In this event, each party will choose a competent appraiser within 20 days after receiving a written request from the other. The two appraisers will choose an umpire. If they cannot agree upon an umpire within 15 days, you or we may request that the choice be made by a judge of a court of record in the state where the "residence premises" is located. The appraisers will separately set the amount of loss. If the appraisers submit a written report of an agreement to us, the amount agreed upon will be the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will set the amount of loss.

(Def.'s Mot. Ex. 1 at 6.)

///

///

**III.     THE COVERAGE DISPUTE**

On June 5, 2023, Wilson sustained water damage in the Property's kitchen and basement (the "Loss"). (Compl. ¶ 7; Answer ¶ 7.) Wilson filed a claim under the Policy for the Loss. (Compl. ¶ 9; Answer ¶ 9.) Liberty accepted coverage for Wilson's claim subject to the coverage terms, exclusions, limitations, and other applicable provisions. (Compl. ¶ 10; Answer ¶ 10.) Liberty also agreed to pay Wilson $100 per day for additional living expenses ("ALE"). (Compl. ¶ 11; Answer ¶ 11.)

Liberty and Wilson disputed the reasonable and necessary cost to repair the Loss.[1] (Compl. ¶ 15; Answer ¶ 15.) Thus, on January 4, 2024, Wilson invoked the Appraisal Provision and appointed Adam Blagg ("Blagg") as her appraiser. (Compl. ¶ 19; Answer ¶ 19; *see also* Def.'s Mot. Ex. 2, Wilson emailed Liberty requesting appraisal of the claim). Thirteen days later, on January 17, 2024, Liberty appointed John Lewton ("Lewton") as its appraiser. (Compl. ¶ 20; Answer ¶ 20; *see also* Def.'s Mot. Ex. 3, Liberty emailed Wilson identifying Lewton as its appraiser). On or about February 5, 2024, Blagg and Lewton named Roger Howson ("Howson") as umpire.[2] (*See* Blagg Decl. Ex. 3 at 14-15, referencing the relevant emails between Blagg and Lewton where both agreed to name Howson as umpire). To memorialize Howson's appointment,

---

[1] Wilson alleges (and Liberty disputes) that the reasonable cost to repair the Loss is "$112,374.72 and $11,551.28 for contents manipulation." (Compl. ¶¶ 32, 34; Answer ¶ 32.) Liberty has issued Wilson "$18,049.37 in dwelling payments" and "$36,600.00 in ALE payments." (Answer ¶ 33.)

[2] The parties appear to dispute the date of Howson's appointment. (*See* Def.'s Mot. at 6, claiming that Howson was appointed at some point before February 5, 2024; *see also* Decl. Adam Blagg Supp. Pl.'s Resp. Def.'s Mot. ("Blagg Decl.") ¶ 4, ECF No. 11, claiming that Howson was appointed "on or about February 8, 2024"). There is no dispute that on February 5, 2024, Blagg agreed to use Howson as the umpire, if needed. (*See* Blagg Decl. Ex. 3 at 14, Blagg acknowledged receiving Lewton's message proposing Howson as the umpire and stated that "[i]f we need an umpire at some point, we can . . . call [Howson] into the appraisal").

PAGE 3 – OPINION AND ORDER

Blagg and Lewton signed a Declaration of Appraisal ("DOA") and Declaration of Umpire ("DOU"). (*See* Blagg Decl. Ex. 2 at 1-2, demonstrating that Blagg signed the DOA and DOU; *see also* Blagg Decl. Ex. 3 at 1, reflecting that Lewton declared that he signed the DOA and DOU).

On March 18, 2024, Blagg emailed Howson about his "impasse" with Lewton and asked Howson to schedule "a hearing on th[e] claim" as soon as possible. (Def.'s Mot. Ex. 5.) On April 1, 2024, Blagg emailed Lewton stating that Wilson had "paused" and may withdraw from the appraisal process and instead pursue litigation. (Def.'s Mot. Ex. 6.) On April 17, 2024, Wilson informed Liberty of her intent to withdraw from the appraisal process. (Decl. Kimonti Wilson Supp. Pl.'s Resp. Def.'s Mot. ("Wilson Decl.") ¶ 11, ECF No. 10; *see also* Blagg Decl. ¶ 10, addressing these events).

On April 29, 2024, Wilson filed this action against Liberty in state court. (Compl. at 1.) On May 28, 2024, Liberty timely removed to this Court based on diversity jurisdiction. (Notice Removal at 1-4.)

## DISCUSSION

Liberty moves to compel Wilson to resume appraisal and stay this case pending the outcome. (Def.'s Mot. at 2.) Wilson opposes Liberty's motion on two grounds. First, Wilson argues that appraisal was permissive, not a condition precedent to filing suit. (Pl.'s Resp. Def.'s Mot. ("Pl.'s Resp.") at 6, ECF No. 9.) Second, Wilson argues that even if the appraisal was a condition precedent, Liberty's breach relieved Wilson of any obligation to satisfy such a condition. (*Id.* at 9.) For the reasons explained below, the Court grants Liberty's motion to resume appraisal.

///

///

PAGE 4 – OPINION AND ORDER

I.      APPLICABLE LAW

Under Oregon law, courts review appraisal provisions under common law contract principles. *See Portland Gen. Elec. Co. v. U.S. Bank Tr. Nat'l Ass'n*, 218 F.3d 1085, 1090 (9th Cir. 2000) (explaining that "Oregon courts have distinguished appraisals from arbitrations and . . . expressly held that appraisals are not governed by Oregon's arbitration statute," and that "appraisals continue to be reviewed under common law contract principles") (citations omitted); *see also Budget Rent-A-Car v. Todd Inv. Co.*, 603 P.2d 1199, 1201 (Or. Ct. App. 1979) ("[The Oregon] Supreme Court has noted that arbitration statutes do not apply to appraisal agreements."). Oregon courts "play a limited role in construing appraisal agreements, serving only to enforce the parties' bargain[.]" *Portland Gen. Elec.*, 218 F.3d at 1090 (citing *Raytheon Co. v. Rheem Mfg. Co.*, 322 F.2d 173, 182 (9th Cir. 1963)); *see also Budget Rent-A-Car*, 603 P.2d at 1202 (concluding that under Oregon law, appraisal agreements, like arbitration agreements, are construed broadly). "It is therefore improper for the court . . . to add a gloss to the parties' own language." *Raytheon Co.*, 322 F.2d at 182.

To interpret contracts, Oregon courts follow a three-step process. *See Winamaki v. Umpqua Bank*, 521 P.3d 846, 848-49 (Or. Ct. App. 2022) (citing *Yogman v. Parrott*, 937 P.2d 1019, 1021 (Or. 1997)). As relevant here, "[t]he court first examines the text of the disputed provision[] in the context of the agreement as a whole and in light of the circumstances underlying the contract formation." *Id.* at 848. "If . . . the provision is clear, the court's analysis ends[.]" *Id.*

Where an agreement "expressly or by implication makes appraisal a condition precedent to action on a contract, failure to implement such appraisal constitutes a failure to perform a condition precedent." *Budget Rent-A-Car*, 603 P.2d at 1202; *see also Portland Gen. Elec.*, 218 F.3d at 1090 ("If the appraisal was rendered in accord with the contract, it is final and binding

PAGE 5 – OPINION AND ORDER

upon the parties 'absent a showing of fraud, bad faith, or a failure to exercise honest judgment.'" (quoting *Lincoln Constr., Inc. v. Thomas J. Parker & Assocs., Inc.*, 617 P.2d 606, 609 (Or. 1980))).

For example, in *Molodyh v. Truck Insurance Exchange*, the Oregon Supreme Court interpreted Oregon Revised Statute ("ORS") § 742.232,[3] a statutorily prescribed appraisal provision required in all fire insurance policies. 744 P.2d 992, 993 (Or. 1987). Although the primary issue was whether the provision violated the non-demanding party's constitutional right to a jury trial, the Oregon Supreme Court examined the mandatory and binding nature of the appraisal provision. *See id.* at 997-98; *see also* OR. CONST. art. I, § 17 ("In all civil cases the right of Trial by Jury shall remain inviolate."). Looking to the provision's text, the Oregon Supreme Court concluded that because "[ORS § 742.232] does not require an appraisal in *all* cases . . . , at least initially, the appraisal provision is permissive" and "not a condition precedent to litigation[.]" *Molodyh*, 744 P.2d at 997. The Oregon Supreme Court, however, explained that "when one party demands an appraisal . . . the process becomes mandatory and[] . . . [thus] a condition precedent to sustaining any claim in court." *Id.* ("[O]ne party to the contract may unilaterally . . . make the appraisal process mandatory[.]").

In evaluating whether the appraisal award was binding, the Oregon Supreme Court noted that the text "appear[ed] to contemplate that the award [was] binding" but ultimately held the

---

[3] In *Molodyh*, the Oregon Supreme Court addressed ORS § 743.648, the predecessor version of ORS § 742.232. ORS § 742.232 requires that all fire insurance policies contain an appraisal provision. *See JPaulJones, L.P. v. Zurich Gen. Ins. Co. (China) Ltd.*, 533 F. Supp. 3d 999, 1006 (D. Or. 2021) ("In *Molodyh*, the court determined that O.R.S. § 742.232, a mandatory appraisal provision required by the Oregon Insurance Code to be inserted into all fire insurance policies, violated the right to a trial by jury under Article I, section 17 of the Oregon Constitution.").

PAGE 6 – OPINION AND ORDER

award was "binding [only] upon th[e] party" who "demand[ed] appraisal" and could "be deemed to have consented voluntarily to the appraisal process." *Id.* at 997-98. Such a "conclusion . . . [did] not offend the constitutional right to trial by jury." *Id.*; *see also id.* (relying on the provision stating that appraisal "shall determine the amount of actual cash value and loss," and explaining that "[t]o save the statute . . . from running afoul of [the Oregon Constitution], [the Oregon Supreme Court must] construe the provision as non-binding in respect of the non-demanding party").

## II.    ANALYSIS

Oregon law governing the interpretation of contracts, and specifically appraisal provisions, supports granting Liberty's motion to resume appraisal here.

The plain text of the Policy's Appraisal Provision mirrors ORS § 742.232. The Appraisal Provision's first sentence provides that if the insured and insurer "fail to agree on the amount of loss, an appraisal of the loss *may* take place." (Def.'s Mot. Ex. 1 at 6) (emphasis added). The second sentence identifies the requirements necessary to invoke the appraisal provision—namely, "both parties must agree to appraisal and to be bound by the results of that appraisal." (*Id.*) The third sentence explains how the appraisal process unfolds thereafter. (*Id.*, explaining that if both parties agree to appraisal and to be bound by the results of that appraisal, "each party will [begin by] choos[ing] a competent appraiser . . . after receiving a written request from the other").

Examining the Appraisal Provision's text, the appraisal process is nearly identical to the one described in ORS § 742.232. Like ORS § 742.232, the appraisal process is initially permissive, but if both parties agree to appraisal and to be bound by the results of that appraisal, the process becomes mandatory. The only difference between the Appraisal Provision and ORS § 742.232 is that the Appraisal Provision precludes a party from unilaterally making the process

PAGE 7 – OPINION AND ORDER

mandatory, as both parties must "agree to appraisal and to be bound by the results of that appraisal." (*Id.*)

Furthermore, like ORS § 742.232, the Appraisal Provision explicitly provides that if the parties agree to appraisal and to be bound by the results of that appraisal, the process becomes binding. For example, if "both parties [] agree . . . to be bound by the results of that appraisal," the Appraisal Provision provides that "the appraisers [may] submit a written report of an agreement to [the insurer], [and] the amount agreed upon will be the amount of loss." (*Id.*) Alternatively, if the appraisers do not agree on the amount of loss and an umpire is necessary, the Appraisal Provision provides that "[a] decision agreed to by any two will set the amount of loss." (*Id.*)

Thus, the text of the Appraisal Provision is clear: Once the parties agree to appraisal and to be bound by the results of that appraisal, either the appraisers, or one of the appraisers and an umpire, will set the amount of loss. Accordingly, the appraisal process "to that extent [i.e., setting the amount of loss], becomes a condition precedent to sustaining any claim in court." *Molodyh*, 744 P.2d at 997; s*ee also* Order at 1-4, *Wullschleger v. Safeco Ins. Co.*, No. 24-cv-00802-JR (D. Or. July 22, 2024), ECF No. 16 (interpreting a nearly identical appraisal provision and concluding that "the only reasonable reading is that the process is permissive to either party but once invoked, it becomes mandatory . . . on all parties as a condition precedent to bringing a claim in court" (citing *Molodyh*, 744 P.2d at 998)).

Given that the Appraisal Provision's text is clear, the Court's contractual interpretation analysis is complete. *See Winamaki*, 521 P.3d at 848-49 ("If, after examination, the provision is clear, the court's analysis ends, and the provision is applied as the court has construed it."). The remaining issues to address are whether Wilson and Liberty agreed to the appraisal process and

to be bound by the results of the appraisal. If the record demonstrates that the parties so agreed, the Appraisal Provision is mandatory and a condition precedent to any litigation.

Under Oregon law, "[e]very agreement springs from offer and acceptance, sometimes by words alone, sometimes by acts alone, and sometimes by both[.]" *Mendelsohn v. Mendelsohn,* 207 P. 158, 160 (Or. 1922); *see also Ken Hood Constr. Co. v. Pac. Coast Constr., Inc.,* 120 P.3d 6, 11 (Or. Ct. App. 2005) ("In determining whether a contract exists and what its terms are, we examine the parties' objective manifestations of intent, as evidenced by their communications and acts."), *adhered to as modified on reconsideration*, 126 P.3d 1254 (Or. Ct. App. 2006). The parties' words and actions here demonstrate that they agreed to the appraisal process and to be bound by the results.

Wilson originally requested appraisal on January 4, 2024. (*See* Def.'s Mot. Ex. 2, Wilson emails Liberty "requesting appraisal of [her] claim"). Wilson's written request conforms with the Appraisal Provision's requirements. (*See* Def.'s Mot. Ex. 1 at 6, requiring a "written request" to initiate the appraisal process). Wilson then identified her appraiser, Blagg. (*Id.*) In her filings, Wilson does not dispute invoking the Appraisal Provision. (*See* Compl. ¶ 19; Pl.'s Resp. at 4; Wilson Decl. ¶ 8; Blagg Decl. ¶ 3.) Thus, the Court concludes that Wilson agreed to the appraisal process.

Wilson nevertheless argues that she never agreed to be bound by the appraisal's result. (Pl.'s Resp. at 8-9.) Wilson asserts that "[her] choice to demand appraisal was permissive" and revocable "at any time before the process is complete." (*Id.* at 8.) Wilson's argument conflicts with the Appraisal Provision's text. The Appraisal Provision does not provide for parties to exit the appraisal; rather, it provides only for a binding appraisal process upon agreement of the

PAGE 9 – OPINION AND ORDER

parties. (*See* Def.'s Mot. Ex. 1 at 6, establishing the process for mutually invoking a binding appraisal process but not exiting it).

Wilson's words and actions also demonstrate her intent to comply with the Appraisal Provision and be bound by the appraisal results. For example, Wilson (1) hired an appraiser (*see* Def.'s Mot. Ex. 2); (2) stated that she "believed the appraisal process would promptly provide [her] with certainty on the amount [she] would receive" (Wilson Decl. ¶ 8); and (3) emailed Blagg and Lewton requesting that the process "be completed as immediately as possible." (*See* Blagg Decl. Ex. 3 at 4.) These statements and actions support the Court's conclusion that Wilson agreed to be bound by the appraisal result. Thus, Wilson both agreed to the appraisal process and to be bound by the results.

Liberty similarly agreed to appraisal and to be bound by the result. On January 17, 2024, and in accordance with the Appraisal Provision, Liberty appointed its own appraiser in response to Wilson's January 4, 2024, email. (*See* Def.'s Mot. Ex. 3, Liberty selecting Lewton as its appraiser; *see also* Def.'s Mot. Ex. 1 at 6, requiring that each party choose an appraiser within twenty days of receiving a written request from the other). In addition, Liberty procured a DOA and DOU, documents that confirmed Lewton's and Blagg's roles as appraisers and Howson's role as umpire. (*See* Blagg Decl. Ex. 1 at 1-2.) Further, Liberty now seeks to resume the appraisal process. (*See* Def.'s Mot. at 4, arguing that the Court should not allow Wilson to avoid her contractual duty to proceed with appraisal).

Wilson argues that because "Liberty . . . never stated in writing that it is demanding appraisal to resolve the parties' differences," Liberty has not demanded appraisal consistent with the Appraisal Provision. (Pl.'s Resp. at 2.) This argument ignores the Appraisal Provision's text and Oregon law. An Oregon court may find a party to have bound itself to an agreement by its

PAGE 10 – OPINION AND ORDER

words, acts, or both. *See Mendelsohn*, 207 P. at 160. To initiate appraisal, Liberty needed to appoint its appraiser within twenty days of receiving Wilson's written request. (Def.'s Mot. Ex. 1 at 6.) Liberty did just that. (*See* Def.'s Mot. Ex. 3, Liberty emailing Wilson naming Lewton as its appraiser). Liberty also continued the parties' pursuit of the contemplated process by proposing an umpire (*see* Blagg Decl. Ex. 3 at 15, proposing Howson as umpire), signing the DOA and DOU (*see id.* at 1), and seeking to complete the appraisal process. (*See* Def.'s Mot. at 2.) Although the record lacks any express statement by Liberty demanding appraisal, Liberty's words and actions demonstrate that it also agreed to the appraisal process and to be bound by its results. For these reasons, the Court finds that both parties agreed to the Appraisal Provision and to be bound by the results, and appraisal is therefore a condition precedent to litigation.

Wilson's remaining argument is that even if the agreed-upon appraisal process was a condition precedent to filing suit, Liberty's breach relieved Wilson of any obligation to satisfy this condition. (Pl.'s Resp. at 9.) In support of this position, Wilson argues that Liberty "unreasonably delayed the appraisal process, its appraiser unilaterally imposed conditions on the appraisal not found in the policy or Oregon statute, and otherwise worked . . . unnecessarily [to] drive the cost of the appraisal up." (*Id.* at 10.) Wilson therefore argues that Liberty's conduct "constitute[d] a breach of the appraisal process and, at the very least, frustrate[d] the purpose of appraisal." (*Id.*)

Wilson cites a district court decision in support of her argument. *See Fitzgerald v. Am. Fam. Mut. Ins. Co.*, No. 6:14-cv-00497-AA, 2015 WL 5896139 (D. Or. Oct. 6, 2015). In *Fitzgerald*, the plaintiffs asserted that the defendant insurer's "undervaluation of . . . losses, and resulting underpayment of actual cash value, prevented them from complying with the procedures necessary to obtain replacement cost benefits." *Id.* at *6. The plaintiffs in turn asked

PAGE 11 – OPINION AND ORDER

to be "excuse[d] . . . from complying" with their policy's relevant replacement cost procedures. *Id.* In evaluating the plaintiffs' argument, the district court applied the "doctrine of prevention." *Id.* Describing that doctrine, the district court explained that "[w]here the conduct of [one party] has prevented the performance of a contract provision by [the other party],' the [first party] is excused from performing under that provision." *Id.* (quoting *Anderson v. Allison*, 471 P.2d 772, 774 (Or. 1970)).

Wilson has not demonstrated that Liberty prevented her from completing the contemplated appraisal process here. Wilson emphasizes that Liberty's appraiser (Lewton) was "confrontational, uncooperative, and dilatory" (*see* Wilson Decl. ¶ 9), and that Blagg complained that Lewton delayed selecting an umpire, unilaterally required him to sign the DOA and DOU, and failed to respond to his communications. (*See* Blagg Decl. ¶¶ 4-5, 10.) Although the record reflects that the two appraisers did not work well together,[4] the record does not support Wilson's theory that Liberty prevented her from completing the appraisal process.

During the appraisers' umpire selection process, Lewton investigated Blagg's proposed umpires and proposed his own umpires. (*See* Blagg Decl. Ex. 3 at 17, 21, emailing Blagg about the umpires). When the appraisers disagreed, Lewton made "an effort to compromise" and proposed Howson as an umpire. (*Id.* at 15.) By comparison, Blagg stated that his proposed umpires were "beyond reproach and absolute experts" and Lewton's were "industry insiders." (*See id.* at 16, 18-19, 22.) Lewton and Blagg eventually agreed to select Howson as the umpire on or about February 5, 2024, nineteen days after Liberty appointed Lewton, only four days after

---

[4] The same two appraisers were involved in the recent dispute in which the court rejected the same arguments Wilson makes here and compelled appraisal to resume. *See Wullschleger*, No. 24-cv-00802-JR, at 3 (D. Or. July 22, 2024), ECF No. 16 (noting that the plaintiffs selected Blagg and the defendant selected Lewton as appraisers and their dealings resulted in a similar breakdown in the appraisal process).

PAGE 12 – OPINION AND ORDER

the Appraisal Provision's fifteen-day target, and prior to either party invoking the option to refer the umpire selection to a court. (*See id.* at 14, agreeing to use Howson as an umpire if necessary; *see also* Def.'s Mot. Ex. 1 at 6, providing that if the appraisers cannot agree on an umpire within fifteen days, either party may request that the selection be made by a judge of a court of record).

While it is true that Lewton's inspection of the Property was delayed due to a missed email (*see* Blagg Decl. Ex. 3 at 1, apologizing for missing Blagg's signing of the DOA and DOU), the delay lasted only sixteen days and Lewton accepted responsibility for his error. (*Id.*) By March 18, 2024, and within twenty days of signing the DOA and DOU, Blagg and Lewton performed their appraisal inspections and submitted their estimates to Howson. (*See* Def.'s Mot. Ex. 5, emailing Howson and declaring that the appraisers were at an impasse). The umpire was poised to determine the amount of loss in a timely manner before Wilson withdrew from the appraisal process and filed this case.

The record does not support Wilson's theory that Liberty prevented Wilson from completing the contemplated appraisal. Rather, both Liberty's and Wilson's actions were consistent with the terms of the Appraisal Provision. Accordingly, Wilson was not excused from satisfying the Appraisal Provision, and appraisal is a condition precedent to this litigation.

## CONCLUSION

For the reasons stated, the Court GRANTS Liberty's motion to compel appraisal and stay proceedings (ECF No. 6), and STAYS this case. The parties shall file a joint status report in sixty days, or within seven days of the completed appraisal proceedings, whichever date is earlier.

**IT IS SO ORDERED.**

DATED this 1st day of November, 2024.

*Stacie F. Beckerman*
HON. STACIE F. BECKERMAN
United States Magistrate Judge

PAGE 13 – OPINION AND ORDER